Filed 8/10/26  Dixon v. Eco Services Operations Corp. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| CHAUNTAE DIXON, | B342933 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV20556) |
| v. |  |
| ECO SERVICES OPERATIONS CORP. et al., |  |
| Defendants and Respondents. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed in part, reversed in part, and remanded.

Blair & Ramirez, Oscar Ramirez, Matthew P. Blair and Regina Jurczak; Esner, Chang, Boyer & Murphy, Stuart B. Esner and Rowena J. Dizon for Plaintiff and Appellant.

Cozen O'Connor, Michele B. Miller, Elizabeth Malloy and Nicole H. Perkin for Defendants and Respondents.

———————————————

Chauntae Dixon sued her former employer, Eco Services Operations Corp., and its parent corporation, Ecovyst Catalyst Technologies LLC (collectively Eco Services) for disability discrimination and for maintaining a hostile work environment based on sex. The superior court granted summary judgment in favor of Eco Services, concluding Dixon's termination was legitimately based on her failure to comply with Eco Services' Return to Work (RTW) policy and the alleged harassment was not "sufficiently severe or pervasive" to create a hostile work environment. Dixon appeals. We reverse as to Dixon's hostile work environment claim but otherwise affirm.

## BACKGROUND

Because we are reviewing the grant of summary judgment, we view the facts in the light most favorable to Dixon. (*Nicoletti v. Kest* (2023) 97 Cal.App.5th 140, 144.)

Dixon worked as a Senior Buyer for Eco Services from April 2019 to February 28, 2022. Eco Services operates chemical plants. Dixon negotiated bids for supplies at three of those plants. Dixon's office was at the Dominguez Plant site, a plant that processes toxic and flammable chemicals. Stephen Caro was the Dominguez Plant Manager. Dixon's immediate supervisor, Landry Garcia, worked from Houston, Texas. One of Dixon's direct reports, Vanessa Brannock, worked, like Dixon, at the Dominguez Plant.

### A. *Conduct of Caro and His Assistant*

In 2019, Caro's assistant, a woman, made two comments to Dixon about how it would be prudent to not delay having children because delay could increase the risk of having a child with a disability. Dixon reported the incident to Robert Rice, a regional human resources manager at Eco Services. Rice investigated and

told Caro's assistant to cease commenting on her coworker's personal life. After Dixon reported the incident, Caro tried to "persuade her to recant her complaint." Dixon did not complain about any further comments from Caro's assistant.

In February 2020, Dixon heard Caro yelling at her direct report, Brannock, for stepping outside her role. Dixon, who was down a hallway and standing behind and to the side of Caro, saw him do something with his hands but she could not see what. Brannock later went to Dixon's office and told Dixon that Caro had grabbed his genitals while yelling at her. Dixon told Brannock she supported her reporting Caro to human resources. Afterwards, Caro went into Dixon's office unannounced, "blocked the exit" by "plac[ing] his body in the room in a way that prohibited her from leaving," and yelled at her for encouraging Brannock to report him. He said he was "significantly bigger in size" than Dixon, which she considered an implied threat. Dixon became terrified of Caro. She told him that because of his behavior in her office she "no longer fe[lt] safe."

Although we discount it on our summary judgment review, Brannock submitted a declaration contradicting Dixon's evidence. She averred Caro "was always friendly and kind to me." She did not witness him sexually harass anyone and she did not remember complaining about Eco Services or Caro. The genital-grabbing incident, she said, never occurred.

In February or March 2020, Dixon began to work remotely. Part of the reason she believes she was allowed to work remotely was her fear of Caro. By March 2020, Eco Services allowed many employees to work from home in response to the COVID-19 pandemic.

3

During her employment, Dixon witnessed Caro demean two female coworkers, namely Melissa Luu and Wendy Maxwell, and witnessed Caro yell at Brannock for throwing out his soda. As to Luu and Maxwell, Dixon saw Caro demean them in safety meetings. Dixon does not elaborate. She believes Luu told her of other inappropriate conduct, but she cannot recall details. Dixon does recall both women telling her they retired because of incidents with Caro, but, again, Dixon cannot recall details.

Dixon declared that she did not see Caro similarly interact with male employees. Dixon believed Caro was hostile to women. She also believed management was aware of this because, as she declared, her supervisor, Garcia, told her the company would have to fill Brannock's role, after she had been laid off, with a man because of "the way" Caro was.

Rice, for his part, denied receiving complaints from Dixon about Caro harassing her based on her sex, but acknowledged both Dixon and Brannock had complained about Caro asking about their work. Rice had told Caro to relay work concerns about Dixon and Brannock to their supervisor, Garcia, rather than engage them directly.

B. *Medical Leave and Termination*

Dixon requested November 16 to November 17, 2021, off work for a medical procedure. Garcia granted the request. Just prior to Dixon's medical leave, Caro complained to Garcia that Dixon was not responsive in her work. Garcia canvassed Dixon's other internal clients within the company and received corroborating negative feedback from them. After speaking with Dixon and telling "her she needed to engage and get involved," Garcia decided not to implement a formal improvement plan. Garcia wrote to Rice to apprise him of the conversation with

4

Dixon, and concluded he "would like to press the issue of getting her back in the plant. I think that is really the key to getting her involved. Not sure how we attack that based on what I have told you."

On November 18, 2021, Dixon emailed Garcia that her recovery was taking longer and she would contact human resources to request time off. Four days later, she advised Garcia she would be off work until January 3, 2022. That same day, Rice had the benefits coordinator contact Dixon about her medical leave. Rice also advised the coordinator that Dixon "does not want to report to the Dominguez Plant due to COVID fears, however she traveled to Michigan for surgery." Rice noted the company learned Dixon was in Michigan, not California, "when a request was made for her to attend safety training at the Dominguez plant." Eco Services provided short-term disability paperwork that referenced the company's RTW policy. Dixon filed a claim and took leave until January 3, 2022.

Dixon returned to work remotely on January 4, 2022. Garcia informed Dixon two days later that the company needed clearance from Dixon's doctor and the company's occupational healthcare partner. Dixon claims she was unaware that a physical exam was required. She provided her own doctor's clearance.

Rice then emailed Dixon: "Your role is a plant role due to the nature of your work and that is the reason you are required to complete the Dominguez plant RTW process. Your role cannot be accommodated as a work-from-home position because of the Dominguez plant employee interface requirements. [¶] I think the communication gap [regarding RTW] resulted from our assumption that you were working from home in California. [We]

5

typically send[] communications to an employee's home address." Garcia also believed Dixon's job required at least some on-site presence at the Dominguez Plant, as well as travel to two other plants. Around the fall of 2021, as the COVID-19 pandemic eased, Rice stated "all employees [had been] asked to return to the plant." According to Garcia, however, there was no company policy, at least back in November 2021 when Dixon's leave began, requiring her to work in person as "she was home for COVID." Garcia could not remember exactly when COVID-19 travel restrictions loosened, but thought it was sometime in 2021.

Rice testified that all employees returning from leave had "to be certified to be able to comply with evacuation procedures" because the Dominguez Plant handled dangerous chemicals, and "[a]nybody in the admin[istrative] area is subject to that exposure depending on operational upsets, which way the wind's blowing, those kinds of things." The company also produced evidence that two other employees sited at the Dominguez Plant, including Caro's assistant, were required to comply with the company's RTW policy.

Dixon initially agreed to the RTW physical examination. When she arrived at the clinic, she was provided a HIPAA release. She was also told she would be "doing blood work." Dixon refused to sign the release and was not allowed to proceed with the physical examination. Afterwards, Rice told Dixon she could strike through any objectionable portions of the HIPAA release. Dixon declined, refused to sign the release, and was eventually terminated effective February 28, 2022, with the company citing her refusal. The company paid Dixon from her return to work in January through her termination.

6

## C. *Dixon's Suit*

Dixon filed suit against Eco Services and Caro alleging these seven causes of action: (1) disability discrimination; (2) retaliation for requesting reasonable accommodations; (3) unlawful inquiry regarding physical condition; (4) hostile work environment based on sex; (5) retaliation for engaging in protected activity; (6) retaliation in violation of the California Family Rights Act; and (7) wrongful termination in violation of public policy. (See Gov. Code, §§ 12940, subds. (a), (m), (f), (j), (h), 12945.2; further unspecified statutory references are to the Government Code.) The complaint's prayer sought punitive damages. The first, fifth, sixth, and seventh causes of action proffer different theories for why Dixon's termination was unlawful. The second cause of action asserts Eco Services demanded "medical disclosure requirements" in retaliation for Dixon having requested medical leave. The third cause of action alleges Eco Services made an unlawful medical inquiry when it required her to undergo a physical exam and sign the provider's HIPAA form. The fourth cause of action, for hostile work environment, referenced Caro's behavior.

Caro died, and Dixon agreed to his dismissal.

Eco Services moved for summary judgment or, in the alternative, summary adjudication. Dixon opposed.

The trial court granted summary judgment. Dixon's disability discrimination causes of action failed because Eco Services had shown a legitimate, nondiscriminatory basis for terminating Dixon: her failure to comply with the company's RTW policy. Her hostile work environment cause of action failed because she had not shown severe or pervasive harassing conduct. Her termination cause of action in violation of public

7

policy failed because it was derivative of her other causes of action.  Finally, her request for punitive damages failed because she had not shown "anyone acted with malice, fraud, or oppression."

Dixon timely appealed.

## DISCUSSION

We review de novo a grant of summary judgment.  (*County of Los Angeles v. Quinn Emanuel Urquhart & Sullivan, LLP* (2025) 115 Cal.App.5th 489, 504.)  We assess the record in the light most favorable to the opposing party to determine if there is a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

### I.     Discrimination Causes of Action

Dixon's first, second, fifth, sixth and seventh causes of action, which allege discrimination, retaliation, and wrongful termination under the Fair Employment and Housing Act or the California Family Rights Act, are subject to a familiar burden-shifting analysis.  (See *Wilkin v. Community Hospital of the Monterey Peninsula* (2021) 71 Cal.App.5th 806, 820 (*Wilkin*) [FEHA claims subject to *McDonnell Douglas* rubric]; *Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th 546, 560 [CFRA claims analyzed under same rubric]; see also *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 [wrongful termination in violation of public policy claim is derivative of underlying claim].)  Under this rubric, established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, the employer has " ' "the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." ' " (*Hodges v. Cedars-*

8

*Sinai Med. Ctr.* (2023) 91 Cal.App.5th 894, 904 (*Hodges*).) If the employer surpasses this initial hurdle, the burden shifts, and " 'plaintiff must challenge the employer's proffered reasons as pretexts for discrimination or offer other evidence of a discriminatory motive.' " (*Wilkin*, at p. 821.)

We, like the parties, examine the first, second, fifth, sixth, and seventh causes of action together. Applying the appropriate standards, we conclude that summary judgment was proper as to these causes of action.

> A. *Refusing to Comply with Eco Services' RTW Policy Was a Legitimate, Nondiscriminatory Reason for Dixon's Termination.*

"Reasons [for adverse employment decisions] are 'legitimate' if they are 'facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination.' [Citation.] Issues that are ' "nondiscriminatory on their face" and "honestly believed" by [the] employer, will suffice even if "foolish or trivial or baseless" '; the 'ultimate issue is whether [the] employer "honestly believed in the reasons it offers." ' " (*Hodges*, *supra*, 91 Cal.App.5th at p. 910, first bracketed insertion added.) For example, in *Hodges*, refusing the flu vaccination was a legitimate and nondiscriminatory reason for a hospital to terminate an administrative employee, even though the employee had no patient contact. (*Id.* at pp. 898, 910–912.) When "considering whether implementing [a] policy on a workforce-wide basis [is] a legitimate, nondiscriminatory reason for terminating [a] plaintiff, the wisdom of the policy is not at issue." (*Id.* at p. 912.)

Further, an employer may require medical inquiries or examinations of employees when "job related and consistent with

9

business necessity." (§ 12940, subd. (f)(1)–(2); see Cal. Code Regs., tit. 2, § 11071, subd. (d)(1).) Under state regulations, "job related" means "tailored to assess the employee's ability to carry out the essential functions of the job or to determine whether the employee poses a danger to the employee or others due to disability," while "business necessity" means "the need for the . . . medical examination is vital to the business." (Cal. Code Regs., tit. 2, § 11065, subds. (k), (b).)

Eco Services has shown a legitimate, nondiscriminatory basis for terminating Dixon. Dixon refused to participate in the company's RTW examination. The RTW policy applied to all employees who were absent for seven or more consecutive days due to illness or injury. The policy included a RTW physical examination. There were no exceptions. The rationale for the RTW physical examination was to ensure all employees could "comply with evacuation procedures" due to the hazardous and flammable materials at the company's plants. The policy applied to administrative employees because they too were "subject to . . . exposure depending on operational upsets, which way the wind's blowing, those kinds of things." The physical examination itself was conducted on a "case by case" basis, tied to the employee's medical procedure or condition as assessed by the doctor conducting the examination. The doctor who conducted the exam determined what was necessary, which could be a question-and-answer session or a physical examination.

On appeal, Dixon does not challenge the rationale underlying the company's RTW policy. She instead contends the policy's requirement that an employee sign a broad HIPAA release is neither job related nor consistent with business necessity. She goes so far as to suggest the form would never be

10

legitimate as to any employee.  We disagree, as Dixon's argument relies on a misreading of the release.

The release states:  "I give Concentra authorization to release to my employer, insurance company, and/or their representatives any medical information, including any psychotherapy notes, psychiatric information, sexually transmitted diseases, alcohol and drug abuse and/or HIV/AIDS status, *which is obtained as part of the evaluation and/or treatment for this work related injury/illness, or employment-related examination.*"  (Italics added.)  The release does not unrestrictedly seek to obtain any particularly sensitive medical information, such as that involving sexually transmitted diseases, HIV/AIDS, or the like, which are the portions Dixon takes issue with.  It instead authorizes the medical provider to release "any medical information" that "is obtained as part of the . . . employment-related examination."  And, as Dixon acknowledges elsewhere in her opening brief, the company "produced evidence that the physical examination component of its RTW policy was 'tailored' to the employee's position and 'only verifies that an employee can perform their job functions and comply with all Plant safety procedures so that, in the event of an evacuation, the employee would be able to safely exit the plant without undue risk to themselves or others.'"  The release, read in proper context, simply allowed the medical provider to transmit to the company the results of a tailored, work-related examination.

Eco Services, contrary to Dixon's argument, was not required to show that the listed potential examples of protected health information in the release were "job related" and "consistent with business necessity" if the examination was both.

11

A contrary rule would require impossibly narrow forms tailored to each employee. And without HIPAA releases, which are a common feature of interacting with the health care industry, the employer could not receive any useful information from a medical provider and a legitimate RTW process would be frustrated. Moreover, the company allowed Dixon to strike out any offending language from the release, but she refused this accommodation. Had the exam delved into Dixon's HIV status and sexual history and had she been fired for not having disclosed such information, we would have a different case. That is not this case. An exam never occurred.

B. *Dixon Has Not Shown Eco Services' Stated Rationale Was a Pretext for Discrimination.*

The burden thus shifted to Dixon to " 'produce evidence that, taken as a whole, permits a rational inference that intentional discrimination was a substantial motivating factor in the employer's actions toward the plaintiff.' " (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 58, italics omitted.) Dixon has not.

Dixon argues, in one sentence, that the company couched the grounds for her termination as noncompliance with the RTW process when the real reason was her taking leave in Michigan rather than California. But Dixon presented no substantial evidence that the location of her leave was a factor in her termination. Nor has Dixon offered reasoning or legal authority for why particular statements about her location, in this context, implicated a decision criterion that FEHA regulates. Dixon also argues that since she was not required to undergo a physical examination when she was hired, a jury could disbelieve the company's application of its company-wide RTW policy to her was

legitimate. But we do not analyze the "wisdom" of Eco Services' RTW policy. (See *Hodges*, *supra*, 91 Cal.App.5th at p. 912.) And again, Dixon has not offered any reasoning or legal authority to support her contention. "We may and do ' "disregard" ' " these " ' "conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions [appellant] wants us to adopt." ' " (*Bjoin v. J-M Manufacturing Co., Inc.* (2025) 113 Cal.App.5th 884, 900.)

Dixon also contends the company's assertion it had required all employees, including Dixon, to return to the office was not credible. Dixon points to an absence of a company memorandum requiring the Dominguez plant employees to return to site work and testimony that Dixon's supervisor, Garcia, had not, in November 2021, specifically asked her to return to office even while stating to a colleague it was important that she do so. But Dixon has not shown any reason to discredit the testimony that employees were being asked to return to the office as the COVID-19 pandemic was easing. More germane, Dixon's role was ultimately and uncontrovertibly, at least in part, in person, and she remained subject to the company's RTW policy.

Lastly, Dixon has not meaningfully contended with Eco Services' showing that it worked with her to assuage her concerns about the RTW process. For two months, the company paid Dixon while addressing her concerns with the HIPAA release.

For these reasons, Dixon has failed to show a triable issue regarding pretext. The trial court did not err in granting summary judgment to Eco Services on her first, second, fifth, sixth, and seventh causes of action.

13

## II.    The Unlawful Inquiry Cause of Action

Dixon's third cause of action alleges Eco Services unlawfully inquired into her physical condition. As discussed above, an employer may inquire of an employee's physical condition only when "job related and consistent with business necessity." (§ 12940, subd. (f)(1)–(2); Cal. Code Regs., tit. 2, § 11071, subd. (d)(1).) Dixon contends that Eco Services had not shown the HIPAA release component of its RTW policy met these requirements because it had not established how "any medical information, including any psychotherapy notes, psychiatric information, sexually transmitted diseases, alcohol and drug abuse and/or HIV/AIDS status" would help determine if Dixon could evacuate safely.

As discussed above, this argument misreads the HIPAA release. The release, read in proper context, simply allowed the medical provider to transmit to the company the results of a tailored, work-related examination. There was no improper inquiry based on the topics referenced in the release.

Moreover, the HIPAA release appears to make no inquiries of Dixon. As Dixon notes elsewhere in her opening brief, a regulation governing pre-employment practices prohibits "ask[ing] general questions on disability or questions likely to elicit information about a disability . . . at any time before a job offer is made." (Cal. Code Regs., tit. 2, § 11070, subd. (b)(2).) The regulation then lists eight examples of "[p]rohibited [i]nquiries," such as "[d]o you have any particular disabilities" or "[h]ave you ever been treated for [certain] diseases or conditions." (*Ibid.*) The HIPAA release, however, did not ask any questions of Dixon. It did not ask whether she had a sexually transmitted disease, abused alcohol or drugs, or had HIV/AIDS. It did not ask why

14

she had surgery or whether she had any medical restrictions from it. The form was a release, not a questionnaire.

Dixon relies on an unpublished federal district court case from Illinois addressing federal law to argue that the release itself constitutes an inquiry and, at that, an unlawful one. (*Nawara v. County of Cook* (N.D.Ill. Mar. 28, 2019, No. 17 C 2393) 2019 U.S.Dist. Lexis 52632.) There, the court found a HIPAA waiver, which "would have permitted any of [plaintiff's] health care providers to release all of his medical records" to his employer, was an inquiry under the Americans with Disabilities Act. (*Id.* at pp. *1–2, *17–18.) The court noted the employer had foisted the HIPAA waiver on the plaintiff after singling him out for seeking to report workplace harassment. (*Id.* at p. *2.) It also noted the form was not tailored but would have authorized disclosure of " '[a]ll healthcare information' from any medical provider, without specifying any particular time-frame or medical condition . . . ." (*Id.* at p. *23.) The court distinguished a reported federal decision that concluded a pre-employment release form " 'does not come under the definition of a prohibited medical inquiry, as it does not ask any questions about an individual's medical history or her limitations.' " (*Id.* at p. *19, quoting *Green v. Joy Cone Co.* (W.D.Pa. 2003) 278 F.Supp.2d 526, 540.) Even if the HIPAA release here were an "inquiry," the release allowed only the disclosure of information gained from the RTW examination and did not grant access to Dixon's entire medical history as in *Nawara*. The release requirement also applied to everyone returning to work after leave and did not single out Dixon as in *Nawara*. *Nawara* is distinguishable.

Accordingly, summary judgment was proper as to the third cause of action.

15

### III.   Hostile Work Environment Cause of Action

Dixon's fourth cause of action alleges a hostile work environment due to harassment "on the basis of her sex."  "[I]t is an unlawful employment practice for an employer, 'because of . . . sex, . . . to harass an employee.'  (§ 12940, subd. (j)(1).)  Under the statutory scheme, ' "harassment" because of sex' includes sexual harassment and gender harassment.  (§ 12940, subd. (j)(4)(C).)"  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).)  To prevail on her hostile work environment cause of action, Dixon must establish she endured "harassing conduct that was (1) unwelcome, (2) because of sex or gender, and (3) sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment."  (*Kruitbosch v. Bakersfield Recovery Services, Inc.* (2025) 114 Cal.App.5th 200, 213; see also *Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627 (*Bailey*).)

Moving for summary judgment, defendants only sought to defeat Dixon's hostile work environment cause of action on the ground that the conduct Dixon alleged was insufficiently severe or pervasive.  Opposing the motion, Dixon primarily relied on the chain of events that began when she saw Caro doing something with his hands while yelling at Brannock, Dixon's subordinate.  Brannock, says Dixon, then told Dixon that Caro had grabbed his genitals while yelling at her, and Dixon encouraged her to report the incident.  Caro later came to Dixon's office, blocked the exit, called out his significantly bigger body size than hers, and yelled at her for encouraging Brannock to report him to HR.

Generally, "conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff."  (*Lyle, supra,* 38

16

Cal.4th at p. 284.)  But even "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment."  (§ 12923, subd. (b).)  And an " 'isolated incident of harassing conduct may qualify as "severe" when it consists of "a physical assault or the threat thereof." ' "  (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 608–609, italics omitted, quoting *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1049.)

In *Sheffield v. Los Angeles County* (2003) 109 Cal.App.4th 153, 157–158 (*Sheffield*), a coworker made unwanted romantic advances towards plaintiff over the course of several days.  Then, while the plaintiff was trying to avoid that coworker, they crossed paths in a hallway, and the coworker "made a fist which she slammed into her other palm while at the same time looking at [plaintiff] and frowning."  (*Id.* at p. 158.)  Evaluating this scenario, the Court of Appeal concluded that until the hallway incident, the coworker's "actions had amounted to boorish or overbearing behavior," but "[t]he slamming the fist into the palm added an aspect of violence that could be found to have changed the conditions of . . . employment."  (*Id.* at p. 163.)  Because "violence or the threat of violence [was] added to the equation, a trier of fact could determine [plaintiff's] conditions of employment had been drastically changed and that she was in a hostile work environment."  (*Id.* at pp. 163–164.)

*Sheffield* counsels that Dixon has presented a triable issue of fact on the severity of the alleged harassment.  Missing here is the fist gesture, but present are an implicit threat — "I'm bigger

17

than you" — combined with blocking Dixon's exit and screaming to instill fear.  (See Cal. Code Regs., tit. 2, § 11019(b)(2)(B) [harassment includes "impeding or blocking movement"].)  Caro's comment may have been made with a wink and a smile, or it may never have been made at all, but we cannot reject severity as a matter of law.  This is particularly so given Eco Services, in their respondents' brief on appeal, has nothing to say against Dixon's opening-brief assertion of a threat of violence.  Accordingly, we will reverse summary judgment on the hostile work environment cause of action.

Eco Services could be viewed as suggesting we nonetheless affirm on the ground that none of the alleged harassment was because of Dixon's gender.  But Eco Services's did not develop this alternative argument under a separate subheading of their respondents' brief.  (See *Dameron Hospital Assn. v. Progressive Casualty Ins. Co.* (2025) 111 Cal.App.5th 530, 541 ["Each argument made in an appellate brief must be 'under a separate heading or subheading summarizing the point' "].)  Regardless, the "because of sex" issue was not briefed in the trial court, and we decline to consider it.  (See *Folberg v. Clara G. R. Kinney Co.* (1980) 104 Cal.App.3d 136, 140.)

## IV.   Punitive Damages

The trial court concluded no prayer for punitive damages could survive as to any of the causes of action because Dixon had not shown Eco Services acted with malice, fraud, or oppression.  (Civ. Code, § 3294, subd. (a).)  Summary judgment striking Dixon's prayer for punitive damages was proper as to each of her causes of action that were properly dismissed.  (See *Atalla v. Rite Aid Corp.* (2023) 89 Cal.App.5th 294, 323 ["damages must attach to a cause of action"].)  We must separately consider Dixon's

18

surviving hostile work environment claim.  Although Dixon argues on appeal, "[i]t should be up to a jury to decide whether Eco Services acted oppressively and in conscious disregard of Dixon's rights *when it conditioned Dixon's continued employment on her signing the HIPAA release, and when it terminated Dixon's employment because she refused*" (italics added), Dixon conspicuously makes no argument that Eco Services should be subject to punitive damages for Caro's harassment.  It was Dixon's burden to show prejudicial error in the trial court's punitive damages ruling.  She has not.

## DISPOSITION

We affirm the judgment except we reverse as to the fourth cause of action alleging a hostile work environment.  The parties shall bear their own appellate costs.

SCHERB, J.

We Concur:

WILEY, Acting P. J.

VIRAMONTES, J.

19